**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| In re:<br><br>MISS ANN CHARTERS, LLC,<br><br>    Debtor. | Case No.  12-10717-RGM<br>(Chapter 11) |
| MISS ANN CHARTERS, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>CHESAPEAKE MARINE RAILWAY, LLC,<br><br>    Defendant. | Objection to Proof of Claim 2 of<br>Chesapeake Marine Railway, LLC |

**MEMORANDUM OPINION**

This case concerns the costs of repairs made to the Miss Ann, a classic 126-foot fan tail motor yacht built in 1926 by Pusey and Jones.  It is a Presidential Yacht comparable to Sir Winston Churchill's yacht "Welch Liberty" and General Douglass MacArthur's former Navy signal vessel.

The Miss Ann was due for a Coast Guard inspection to extend its Certificate of Inspection which is required before passengers may board the vessel.  The debtor obtained an estimate from the Chesapeake Marine Railway, LLC, which is known as the Chesapeake Boat Works, on January 4, 2011, to haul it out, have the Coast Guard inspect it, and return it to the water.  The estimate was $6,102.75.  The Miss Ann put into the shipyard on January 30, 2011; was hauled out on February 4, 2011; first inspected by the Coast Guard on February 4, 2011; and was re-launched on March 24, 2011.  The debtor ordered the work stopped before all of the Coast Guard-required repairs were completed.  The shipyard filed a proof of claim for $124,213.88 to which the debtor

1

objected.

The January 4, 2011 estimate was not a fixed price contract to make all required repairs. The estimate stated that:

> The numbers represented above are to be used as an estimate only. The above Cost Summary does not constitute a warranty of final pricing. Estimates are subject to change if the project specifications are changed in any way.

Ex. B, Estimate dated January 4, 2011. The estimate preceded the Coast Guard inspection which was principally conducted on Friday, February 4, 2011. The Coast Guard listed 43 items on the Worklist. Ex. E, Worklist. On Monday, February 7, 2011, Jon Farinholt, one of the two owners of the shipyard, sent an email to Guy Schroff, one of the two owners of the debtor, telling him that the shipyard was proceeding with the work his brother, Rick Farinholt, the other owner of the shipyard, and Frank Schroff, Guy's brother and the other owner of the debtor, had discussed on February 4, 2011. Jon Farinholt also told Guy Schroff that he had "reached out to a number of financial institutions to help secure a loan on the vessel to pay for the repairs." Ex. 24, Email dated February 7, 2011 at 12:49 p.m. The next day, February 8, 2011, the debtor sent Jon Farinholt an email which stated:

> We need to be careful on how work proceeds until we know what we can afford. And we need to see your estimates to know what we are dealing with. Please don't do any work (except for the one hull plate where is rusted through) until we know what the charges are going to be.

Ex. 24, Email dated February 8, 2011 at 11:42 a.m. Jon Farinholt replied later that day:

> Based on our conversation on Friday [February 4, 2011] and what Rick [Farinholt] and Frank [Schroff] discussed yesterday we are working on the following below the waterline items.
>
> 1. Port Shaft and cutlass bearings.
> 2. Removal of the Rudder for repacking and inspection by USCG.
> 3. Bottom steel work (Starboard only) exterior and interior.

> As we also discussed that is difficult to estimate these items and the full repairs until we know the extent of what needs to be done labor wise and what materials need to be purchased.
>
> That said to just complete what we know today on the above we are guessing the cost of labor only to be between $60k to $80K.

Ex. 24, Email February 8, 2011 at 2:25 p.m.

The shipyard gave the debtor an oral "guesstimate" about February 8, 2011, for the required work and followed it up with an email on February 9, 2011. It estimated that the cost of most of the Coast Guard-required repairs would be $84,100. The largest item was welding work below the waterline with an estimate of $47,000 to $60,000. This did not include pre-prep work such as scaling, rust removal and cleaning necessary for proper welds. It also did not include painting after the repair was completed. Ex. C, Email dated February 9, 2011. Nine additional items were added to the Coast Guard list on February 18, 2011.

The shipyard sent its first invoice dated February 4, 2011, for $6,974.70, which the debtor paid. Additional invoices were sent on a weekly basis. The February 11, 2011, invoice was for $13,900.17; February 17, 2011, $9,837.22; February 25, 2011, $8,646.90; March 4, 2011, $7,618.24; March 11, 2011, $12,065.97; March 18, 2011, $13,703.78; March 29, 2011, $16,655.35; April 1, 2011, $4,171.50; April 13, 2011, $1,081.50; and April 30, 2011, $1,236.00. Exs. G through P. There were later invoices as well. Exs. B and Q through Z.

The debtor ordered the shipyard to stop work on February 23, 2011, except to close up the Miss Ann and return her to the water. Guy Schroff wrote to Jon Farinholt:

> As you are aware, I've been concerned regarding costs on this project. I've been forthright regarding our limited funds since the beginning. . .
>
> Frank [Schroff] & I are in agreement that our only option is to close up Miss Ann and return her to the water. Therefore please conclude only that work necessary to

> that end. As I understand it that should be closure of the hull near the starboard stuffing box and the re-assembly of the port shaft and propeller.

Ex. 26, Email dated February 23, 2011 at 9:06 a.m.

> Jon Farinholt acknowledged that email. He wrote:
>
> We understand your situation.
>
> It's important that you fully understand the scope of work that we must do to accomplish your request so that the vessel is safe to go back in the water. Therefore we would like you to come to yard to discuss this work, timing and costs involved.

Ex. 26, Email dated February 23, 2011 at 10:16 a.m.

The shipyard closed up the Miss Ann, completed other work, and returned her to the water. The invoices following the stop-work order were substantial.

A proof of claim constitutes prima facie evidence of the validity and amount of the claim. Fed.R.Bankr.P. 3001(f). Once the presumption is rebutted, the burden of proof is on the claimant to prove the validity and amount of the claim.

There was no express contract between the parties. Jon Farinholt presented a proposed contract to the Schroffs, but they rejected it. While there was an agreement that the Miss Ann would be hauled out and inspected, there was no comprehensive agreement as to the scope of the work to be performed or the cost of the work. Various work was authorized from time to time. The testimony shows that the shipyard exceeded the scope of the authorized work. In addition, James R. Renn, a well-qualified marine surveyor and damage and insurance loss specialist who testified as the debtor's expert, opined that the time expended and the fees charged were excessive. The presumption of the validity and amount of the shipyard's claim was rebutted, and it became necessary for the shipyard to prove the existence of a contract or obligation on the part of the debtor to pay for the work performed and the proper amount of the charges.

An implied contract rests on the principle that one may not enrich himself unjustly at the expense of another. *Rinehart v. Pirkey,* 126 Va. 346, 351, 101 S.E. 353, 354 (1919).  In order to establish a claim for unjust enrichment or *quantum meruit,* the shipyard must show that it conferred a benefit on the debtor and that the debtor knew of the benefit; that the debtor should have reasonably expected to pay the shipyard; and that the debtor accepted the benefit without paying for its value. *Schmidt v. Household Fin. Corp., II,* 276 Va. 108, 116, 661 S.E.2d 834, 858 (2008).  The shipyard cannot recover simply by showing that it conferred a benefit on the debtor.  It must show that there was an implication that the debtor agreed to pay for the benefit. *Nedrich v. Jones,* 245 Va. 465, 477, 429 S.E.2d 201, 208 (1993).

The debtor expected to receive certain benefits and to pay for them when the Miss Ann was hauled out of the water on February 4, 2011, and the Coast Guard inspected it.  However, it immediately became apparent that the extent of the required repairs exceeded the debtor's ability to pay for them.  The Schroffs immediately told Jon Farinholt of the problem.  Initial repairs were undertaken, but on February 23, 2011, the debtor instructed the shipyard to close up the ship and return her to the water without completing the Coast Guard-required repairs.  The repairs reasonably necessary and reasonably anticipated by the parties at this time were repairing the hull, the stuffing box and the port shaft and propeller.  The rudder repair had not been started.  On March 1, 2011, the shipyard – while investigating the rudder area – found a new hole in the hull.  The hole was above the waterline and was repaired with an epoxy patch.  The Miss Ann was re-launched on March 24, 2011.

The debtor disputes the extent of the hull repair.  The shipyard completed the repair by replacing interior frames and replacing the hull plates.  It was a permanent repair.  The debtor argues

5

that the shipyard could have simply welded a few pieces of steel onto the hull as a temporary patch. During this period, the Schroffs knew what was transpiring and did not object to the more extensive work. In these circumstances, the debtors should pay for this work.

However, the stop-work order preceded the shipyard's investigation of the rudder compartment. Upon investigation, it discovered several holes above the waterline. It should not have commenced the investigation. It exceeded the scope of the authorized work which, at that time, was to close up the ship and return it to the water. Once the holes were discovered, they were patched by the shipyard with the consent of the debtor. By this time, the debtor had retained George Zahn to assist it with respect to the repairs and in dealing with the Coast Guard. He developed the epoxy alternative and obtained Coast Guard approval. The debtor should not be charged for the work beyond the authorized scope of the project, that is, investigating the rudder area, but, once the holes were discovered, should pay for the repair.[1]

When the Miss Ann was re-launched, it was discovered that the stuffing box the shipyard rebuilt was overtightened. The stuffing box surrounds the propeller shaft where it penetrates the hull. It is supposed to keep water out of the ship. The parties agree that some water will always seep through the stuffing box, but the bilge pump should be more than adequate to pump it out. By overtightening the stuffing box, the propeller shaft did not rotate properly when engaged and was damaged. Mr. Renn estimated the repair to cost $15,697.50. The shipyard argued that the debtor should have inspected the ship before it went out and would have discovered the problem and avoided the damage. However, Mr. Renn testified that the ship should have been returned to the

---

[1]There was no evidence that the holes would have been fatal. They were above the waterline and would have gone below the waterline only if the ship were at least half loaded. It was not intended to load the ship at all on its transit to another shipyard.

water in good condition with the stuffing box properly adjusted. No pre-cruise inspection should have been necessary for this.[2] The shipyard acknowledged that it overtightened the stuffing box but argued that it did so because it expected the Miss Ann to be in its marina for some time and did not want water to enter through the stuffing box and sink the ship in its slip. This argument is unavailing. The shipyard invoiced and charged for inspections of "all watertight bulkhead areas bow to stern" twice daily while it was tied up at its dock. The ship was equipped with pumps and was in no realistic danger of sinking in its slip from water entering it through the stuffing box. The court accepts the expert's opinion that the shipyard's repair was improperly done, that no pre-cruise inspection should have been necessary and that the cost to repair the damage would be $15,697.50.

In addition to other matters, Mr. Renn testified that the shipyard's charges were excessive because too much time was expended on certain activities. He took exception to certain equipment rental charges, testifying that the equipment would ordinarily be owned by a shipyard. He concluded that the bill was overstated by $19,109.22. The shipyard presented insufficient evidence to the contrary, and Mr. Renn's opinion will be accepted.

The court is aware that in reaching his estimate, Mr. Renn testified that the area of the hull repair was smaller than the shipyard asserted. The shipyard appears to be correct in this regard. The hole appears to have been larger than Mr. Renn estimated, but Mr. Renn's testimony showed the minimum amount that should be charged for the hull repair. It was the shipyard's burden to show that the hole was larger and the allowable cost higher. The shipyard had the burden of proof on this issue and did not present sufficient evidence to support a higher amount. Had Mr. Renn simply stopped with his opinion that the bill was unreasonably inflated, the shipyard would receive nothing

---

[2]There is a conflict between Mr. Renn's testimony and Paul V. Fleury's testimony on this point. The court gave Mr. Renn's testimony greater weight.

7

because it had the burden of proving the proper amount of the bill.  Here, the court relies on Mr. Renn's estimate to determine the minimum amount of the cost of the repairs.  There is insufficient evidence to support more.

The debtor objects to charges to re-launch the vessel.  It asserts that re-launching it should be included in the agreed charge to haul the vessel out of the water.  It stands to reason, it argues, that if the vessel is removed from the water it must be put back in the water and this should be included in the fee for hauling it out.  There is merit to the argument.  More important, though, the invoices show that there was too much time expended on re-launching the Miss Ann.  Although the ship should have been able to use its engine to maneuver in the marina, the shipyard used manual labor to relocate the vessel and to repositing other boats in the marina.  The amount of manual labor appears excessive, particularly if the engine had been used, and was not shown to be necessary by the shipyard.

The shipyard charged $75 to remove a damaged "Miss Ann" sign and to reattach awning on the top level.  The work was done on April 30, 2011, after the stop-work order had issued and was not related to putting the Miss Ann back into the water.  The charge will be disallowed.

The debtor objected to the shipyard's hourly rates.  The estimate stated that the rates were $55 an hour.  They were charged at $65 and $75 an hour.  However, the first invoice was at $65 an hour rates.  The debtor paid the invoice without objection.  While Mr. Renn opined that the work took too many hours, he did not opine that the hourly rate was too high.  The higher rates will be allowed.

The shipyard charged $10,000 for insurance when it found out that the debtor's insurance had lapsed.  However, the shipyard did not purchase any insurance and the charge will be

disallowed. Half of the charge was for part of the post-petition period and was removed from the proof of claim by the shipyard.

The shipyard charged for twice daily inspections after the Miss Ann was returned to the water and while it was tied up in its slip in the marina. There was no evidence that the debtor requested the frequent inspections or even knew about them.[3] While there were time records for all other shipyard employees that supported the work included on the invoices, there were no time records supporting the twice-daily bow-to-stern inspections. Even if the inspections were made, they were unnecessary. The shipyard made the repairs and overtightened the stuffing box to keep water out of the Miss Ann. There was no evidence that water was being taken on that placed the Miss Ann at risk and certainly no evidence that the risk of sinking in the slip would develop so quickly that twice-daily inspections were needed. The burden of proof of the reasonableness and of the necessity of the inspections rests on the shipyard. It did not meet its burden. The charges for the inspections will be disallowed.

The shipyard charged for a new 35-foot piling and timber bolts on five pilings. The invoice states that the piling was pulled up "because the dock lines were placed too high." There is no evidence that this was caused by the debtor. The shipyard re-launched the Miss Ann, moved it to its slip, and – presumably – tied it up. If there were twice-daily inspections as the shipyard asserts, the improper placement of the lines should have been seen and the lines should have been moved.

---

[3]There is a question of whether they even took place. Paul V. Fleury testified that his vessel was tied up close to the Miss Ann. He had been granted special permission to live on his boat while the shipyard worked on various repairs. Although he had a clear view of the Miss Ann and of people coming and going from it, he testified that he did not see any of the 204 inspections that Jon Farinholt asserted he made. He did see Mr. Farinholt on the Miss Ann from time to time to pump water out of it after storms. Mr. Fleury also testified that the repairs made to his boat were not well done. The evidence did not connect this work to the work on the Miss Ann or demonstrate that the repairs to the Miss Ann were similarly of poor quality. This portion of his testimony was disregarded as to the quality of the repairs on the Miss Ann but was considered in evaluating the weight to be given to his testimony.

The charges for these items will be disallowed.

The shipyard also charged for placing a maritime lien on the vessel. There is no basis for shifting the costs of perfecting a lien to the debtor absent an agreement, the debtor's expectation to pay for it and a benefit conferred on the debtor. None of the elements are present. The benefit was to the shipyard, not the debtor.

Two additional charges will be disallowed. The first was for Jon Farinholt's participation in removing rain water from the ship. There are no time records supporting his participation in the work, and the total, if his time were included, would be excessive. There was also a substantial charge to remove about 500 gallons of fuel from the ship. The time expended was excessive and there is no evidence that establishes what a reasonable charge should be.

A chart reflecting charges that will be disallowed is attached to this Memorandum Opinion. The sales tax on disallowed purchases was removed. The record is not clear as to the basis for the environmental fee or how it was computed. The parties may supplement their written statements to identify the statutory or other basis for the environmental fee and show how it should be computed in light of the disallowed charges.

The shipyard requests pre-judgment interest. The claim was not liquidated until this matter was resolved and pre-judgment interest is not appropriate. The court notes that there appear to be sufficient assets to pay all claims in full and that the shipyard's claim appears to be fully secured by the Miss Ann. Interest on the claim should be provided for in the chapter 11 plan at the federal judgment rate from the petition date.

The shipyard's proof of claim will be allowed in the amount of $46,801.94 plus any appropriate environmental fee that may be determined.

Alexandria, Virginia
December 16, 2015

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copies electronically to:

John C. Moore
Thomas J. Stanton

19229

| Invoice/Category | Description | Adjustment | Balance | |
|---|---|---|---|---|
| Proof of Claim | | | $124,213.88 | |
| Renn | Adjustment | $19,109.22 | $105,104.66 | |
| Invoice 3/4/11 | Line 5 to 7: "Needle gun in stern bulk head near rudder post; fire watch; grind holes. Found holes. Assist Chris with needle gunning to investigate holes." | $831.25 | $104,273.41 | Work not authorized; beyond the scope of putting the vessel back into water |
| Invoice 3/29/11 | Work on rudder area | $1,650.00 | $102,623.41 | Work not authorized; beyond scope of putting vessel back into wate |
| | "Launching of vessel and relocate to slip by hand. Position boats in slips to accommodate for Miss Ann." | $3,120.00 | $99,503.41 | Excessive time and expense to relaunch vessel; should have had ability to use engines |
| Invoice 4/30/11 | "Remove damaged 'Miss Anne' sign and re-attach awning to top level" | $75.00 | $99,428.41 | No evidence work requested or necessary |
| Invoice 9/7/11 | Claim of lien on boat | $250.00 | $99,178.41 | No evidence that amount charged is reasonable or necessary. Cost of perfecting lien not shown. |
| | "Re-tie dock lines on Starborad side" | $300.00 | $98,878.41 | Creditor moved vessel to slip and reports twice daily inpsections. Placement of dock lines not shown to be made by debtor and should have been a part of the inspection. Failure to identify misplaced dock ines not the responsibility of the debtor. |
| | "Replacement of one 35' piling; Replace Timber bolts on Five pilings pulled out because dock lines were placed too high." | $2,125.00 | $96,753.41 | See above. |
| Invoice 12/5/11 | Remove water from rudder area and other areas on boat. | $187.50 | $96,565.91 | Billy B's Daily Job Sheet does not reflect Jon's participation; shows 2.5 hours of work. Work was "Bilge water (rain water)" Allowed half of charge which was reflected on Daily Job Sheet |
| Invoice 1/12/12 | Removing fuel from boat | $3,090.00 | $93,475.91 | Excessive time and expense to remove 500 gallons (6 barrels) of fuel from boat |
| Invoice 1/16/12 | Monthly Uninsured Dockage | $5,000.00 | $88,475.91 | Charge for insurance not purchased by creditor; post-petition half backed out of claim |
| Renn | Stuffing box repair | $15,697.50 | $72,778.41 | |
| Invoices on and after 5/16/11 | "Vessel Inspection morning and afternoon . . . Walk through boat and found no issues. Inspect all watertight bulkhead areas bow to stern." | $8,700.00 | $64,078.41 | No evidence that the inpsections were requested or necessary. Inspections made by Jon Farinholt when less expensive individual could have made the inspections. No Daily Job Sheets provided. |
| Sales tax on disallowed items | | $118.75 | $63,959.66 | |
| Finance Charges | | $13,938.21 | $50,021.45 | |
| Environmental Fee | | $3,219.51 | $46,801.94 | |
| Allowed Claim | | | $46,801.94 | |